No. 12351

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

_____

STATE OF MONTANA, ex rel. DENZIL J. BARKER
and BETTY JEAN BARKER,

Petitioners and Appellants,

-vs-

TOWN OF STEVENSVILLE, et al.,

Respondents,

-vs-

ROBERT B. BROWN and FRANCES M. BROWN, et al.,

Plaintiffs and Respondents,

and

TOWN OF STEVENSVILLE,

Plaintiff and Intervenor and Respondent,

-vs-

DENZIL J. BARKER and BETTY JEAN BARKER, et al.,

Defendants and Appellants.

_____

Appeal from:   District Court of the Fourth Judicial District,
               Honorable Jack L. Green, Judge presiding.

Counsel of Record:

    For Appellants:

        Christian, McCurdy, Ingraham and Wold, Polson, Montana
        Keith W. McCurdy argued, Polson, Montana

    For Respondents:

        Murray and Holt, Missoula, Montana
        Harold L. Holt argued, Missoula, Montana
        Larry Persson, Hamilton, Montana
        Robert B. Brown, Stevensville, Montana

_____

Submitted:  April 24, 1974

Decided:  JUL - 2 1974

Filed:  JUL - 2 1974

<u>Thomas J. Kearney</u>
                                        Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment denying an application for issuance of a writ of mandate.

This is a unique case. It is in some respects moot, nevertheless we feel justice requires a study of the matter and the granting of such relief as may be warranted.

In July 1971, Denzil and Betty Jean Barker purchased two lots within the city limits of the Town of Stevensville, Montana. Denzil Barker was disabled and confined to a wheelchair. Because of his limited income and disability, Barker signed a contract to purchase what is commonly called a "double-wide" mobile home. Purchase was made through one Kratofil, a dealer in Hamilton, Montana. After completing arrangements for the purchase, Barkers left Montana on July 17, 1971 for California to sell their home there and move their belongings to Montana. Just prior to leaving they arranged to have one Siphers, the real estate agent who sold them the lots, to secure a building permit for them in their absence. Siphers agreed to so as a favor and acted gratuitously.

Siphers appeared at the Stevensville town council meeting on July 19, 1971 to request the issuance of a building permit. He presented the council with a color brochure, a lot layout plan, and a floor plan. The council felt it needed more information and appointed Robert Weber, the Stevensville police chief, to go to Hamilton, view the mobile home and report back to the council. Mayor Summers also volunteered to view the home. Neither one reported back to the council. Mayor Summers did view the home in Hamilton.

At this point there is a conflict in the testimony. Mayor Summers said he thought the council had authorized him to issue the permit if, in his opinion, the Barker home was similar to a home previously allowed in the town. The council members however deny such authorization and testified they expected Mayor Summers to report back to them with his information.

- 2 -

In any event, after viewing the home, Summers returned to Stevensville and told Raymond Meadows, the town official who issues building permits, to issue one to the Barkers. Meadows started to fill out the permit but lacked information as to the number of rooms, baths, etc. and so did not complete it. He testified that had he had that information he would have issued it at that time. Further Meadows, as town building inspector, caused the town's water main and sewer to be tapped to accept the connections from the Barker home. He testified that water and sewer taps are made as a part of the normal course of events after a building permit has been issued; that the town council's authorization of building permits was normally communicated to him by the mayor and this had been the practice as long as he had been in office.

Later on the same day Summers had told Meadows to issue the permit, he encountered Siphers on the street and told him the permit would issue. Siphers proceeded to Meadows' office to get the permit but he too lacked the information regarding the number of rooms, baths, etc., so the permit did not issue at that time.

On August 7, 1971, at about 11 a. m., Summers again told Siphers that the permit had been granted. Siphers, acting upon that information, called Kratofil in Hamilton and told him the permit had been issued and the home could be moved onto the Barker lots. On August 8 Siphers wrote to the Barkers informing them the permit had been issued. However, the council, Mayor Summers included, went into session on the evening of August 7, 1971 and tentatively rejected the application. That decision was communicated to Siphers by Summers orally on the 8th, after Siphers had written to Barkers.

Kratofil, unaware of the rejection, moved one-half of the home onto the Barker lots on the 9th, but due to high winds was unable to move the second half that day. Later that same day Summers called Kratofil and told him that no permit had issued. Being at a loss, Kratofil consulted counsel and moved the second half of the mobile home a few days later. On August 14, 1971, the town council met in formal session and rejected the application.

- 3 -

On August 17, Barkers returned from California and early on the 18th first learned of their troubles. They immediately gathered their plans, neighbors' affidavits in support, and affidavits of a building contractor and an architect and presented them to the Stevensville Planning Commission. At that time the Planning Commission was in the process of formation and awaiting approval from the county commissioners, hence it had no legal status and was advisory only. The Planning Commission did, however, recommend approval. This decision, along with the plans and affidavits, was resubmitted to the town council.

Shortly after Barkers returned from California two of their neighbors instituted suit against the Barkers seeking an injuntion to compel them to remove the housing unit. The Town of Stevensville intervened, appearing against the Barkers, and cited town ordinances which called for possible jail sentences. On October 29, 1971, Barkers sought a writ of mandate to compel issuance of the building permit. On October 30, 1971, the town council sent a letter to the Barkers ordering them to remove the home. (The home was removed in May 1972). The two causes were consolidated for trial before the district court, sitting without a jury. Judgment was entered in favor of the Town of Stevensville and against the Barkers. They appeal.

During oral argument before this Court, counsel informed the Court the mobile home had been repossessed but that Barkers still own the lots. Ordinarily this would render the appeal moot, but we find other matters in this case which we feel should be commented upon. We will not discuss the issues raised by the Barkers. We find the issue raised by the record, briefs, and argument is whether the conduct of the town council and the mayor of Stevensville was so fundamentally unfair to the Barkers as to require reversal. We hold that it was.

The town council on the basis of the acts of the mayor and clerk should have been estopped from asserting the Barker home would have to be removed from the Town of Stevensville because no building permit had been issued therefore putting the Barkers in violation of town ordinances.

- 4 -

We are aware of the great weight of authority holding that a municipal corporation is not bound by acts or statements of its agents or officers made in excess of their authority, even where a third party has relied thereon to his detriment. See: Anno. 6 ALR2d 960; 3 McQuillin Municipal Corporations, 3rd Ed., § 12.126a. Various rationales have been advanced for such a rule but the most soundly reasoned is that to bind the corporation to acts and statements of its agents or officers would have the effect of making city ordinances and regulations a nullity every time a municipal agent or officer led a third party to act in contravention of such ordinance regulation. 6 ALR2d 960, §4.

This rule could be extremely harsh in its application. It is to mitigate this harshness that some states have fashioned a qualification to this general rule. The Illinois rule as stated in Cities Service Oil Co. v. City of Des Plaines, 21 Ill.2d 157, 171 N.E.2d 605, 608, is:

> "The general rule is qualified, however, to enable
> a party to invoke the doctrine where his action was
> induced by the conduct of municipal officers, and
> where in the absence of such relief he would suffer
> a substantial loss and municipality would be permitted
> to stultify itself by retracting what its agents had
> done."

Application of this qualification has been used sparingly. People ex rel Amer. Nat'l Bank and Trust Co. of Chicago v. Smith, 110 Ill.App.2d 354, 249 N.E.2d 232; City of Rockford v. Sallee, 129 Ill.App.2d 75, 262 N.E.2d 485. Nonetheless it is available for those exceptional cases where its use is justified. Emerald Home Builders, Inc. v. Kolton, 11 Ill.App.3rd 888, 298 N.E.2d 275.

2 Municipal Corporation Law, Antieau (1973 Ed.), § 16A.05, criticizes the general rule, saying:

> "The prevailing rule is unjust and should be
> repudiated or at least qualified."

In 2 Municipal Corporation Law, Antieau (1973 Ed.), §16A.06, a test is suggested for circumstances in which the doctrine should apply:

> "It is suggested that there should be no general rule
> that estoppel is not to be applied in police power
> situations. Rather courts should be encouraged to weigh
> in every case the gravity of the injustice to the citizen

> if the doctrine is not applied against the injury
> to the common weal if the doctrine is applied in
> that case. Where any danger to the public is
> slight and a citizen has made a good faith and sub-
> stantial change in position in reasonable reliance
> upon the conduct or representations of municipal
> officials and agents, several courts have estopped
> the local government from exercising their 'police
> power' in a way inconsistent with their prior re-
> presentations or actions."

We agree with this approach. In cases of this kind there should be a balancing of the municipal corporation's unwarranted assumption of risk of liability for acts or statements of its agents or employees made in excess of their authority against the harm done to good faith, innocent and unknowledgeable third parties who act in reliance upon those representations. It follows that each case will necessarily have to be judged upon its own unique factual situation.

We do not suggest that a municipal corporation will not be able to enforce valid city ordinances when its agents have acted in excess of their authority. However, by the same token, we are not willing to permit the municipal corporation to deny the validity of its agents' actions in all cases. To do so lends itself too readily to situations in which equity and justice would be denied.

Applying what has been said heretofore to the instant case, we find that a town official, the mayor, represented to Barkers' agent that a building permit had issued, when in fact it had not, thereby resulting in a course of action by the Barkers and their agent leading to a substantial loss.

We have a situation where application for a building permit was made to the town council. The town council felt that more information was necessary in order for it to reach a decision. To that end one man was appointed by the council and another volunteered to obtain that information. Neither man ever reported back to the town council. Yet at a subsequent meeting, the application was rejected for lack of that information. Such a procedure does not comport with elemental fairness.

We now have the problem of granting appropriate relief. The housing unit is gone and cannot be put back. We will not go so far as to give the Barkers carte blanche to move any housing unit of their choice onto their lots, without meeting the terms of the applicable ordinances. We do hold however, that upon proper application they are entitled to a fair review, and if denied, a written explanation of the reasons within a reasonable time.

Costs in these consolidated cases shall be taxed in the district court in favor of the Barkers and against the Town of Stevensville, including an attorney fee hereby fixed at the sum of $750.00.

_John Conway Harrison_
Justice

We Concur:

Chief Justice

_Wesley Castles_

Justices.

Mr. Justice Gene B. Daly specially concurring:

I concur with the majority that to prevent unnecessarily harsh results to the common weal in selected cases, where the facts permit, an equitable exception to the rule can be applied. However, once committed to this rationale the Court must proceed to do equity.

Here the majority has given the Barkers the right to a fair review upon proper application. I assume this would be before the municipal authorities, in which case this result could have been obtained without the aid of this Court.

These people asked for the right to proceed to assemble and occupy a two-wide preconstructed home on their property, not carte blanche authority to move any house onto the property. The housing unit is gone by repossession, but nowhere in the record is it indicated it cannot or will not be replaced.

Therefore, the appellants have gained nothing unless equity gives them the relief prayed for.

_____
                  Justice


Mr. Justice Frank I. Haswell specially concurring in Justice Daly's specially concurring opinion:

I concur in the foregoing specially concurring opinion of Mr. Justice Daly.

_____
                  Justice.